IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| DWAYNE TAYLOR ROWLAND, JR., <br><br> Plaintiff, <br><br> v. <br><br> CACHE COUNTY SHERIFF'S OFFICE, et al., <br><br> Defendants. | **ORDER AND MEMORANDUM DECISION GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 1:19-cv-20 TC <br><br> Judge Tena Campbell |

Before the court is Plaintiff Dwayne Taylor Rowland, Jr.'s verified second amended complaint (SAC), which alleges civil rights violations under 42 U.S.C. § 1983. (ECF No. 22.) The five remaining defendants are all Cache County Jail (CCJ) corrections officers, sued in their individual capacities: Officers Adams, Carver, Egbert, Lucas, and Webb. (Id. at 2.) The Defendants have moved for summary judgment (ECF No. 60). For the reasons stated below, the court grants their motion.

Mr. Rowland asserts that the Defendants violated his federal constitutional rights to due process, free exercise of religion, and free speech.[1] (ECF No. 22 at 3–9.) Mr. Rowland seeks a declaratory judgment and damages. (Id. at 14.)

---

[1] The SAC also says, "The Court has supplemental jurisdiction over the plaintiff's state law tort claims …." (ECF No. 22 at 1.) But review of the SAC reveals no other mention of state law tort claims. Any such claims are therefore not addressed further.

The Defendants now move for summary judgment on their affirmative defenses of qualified immunity and Mr. Rowland's failure to exhaust his administrative remedies in CCJ's grievance process.  (Mot. for Summ. J., ECF No. 60.)  The Defendants' motion relies on the following evidence: an affidavit, CCJ policies, and copies of CCJ records.  (ECF Nos. 60-1–4.)  Meanwhile, Mr. Rowland's relevant evidentiary support for his positions is based on the SAC's verified allegations, copies of grievance forms, CCJ records and policies, postcards, letters, and his summary judgment response.[2]  (ECF Nos. 61-1–3, 61-6, 64-1–6, 70-1–2.)[3]

Having thoroughly reviewed all relevant documents with the parties' arguments and evidentiary exhibits, the court grants the Defendants' motion for summary judgment motion on the grounds that Mr. Rowland failed to exhaust his administrative remedies and the Defendants are entitled to qualified immunity.

---

[2] At the end of his summary judgment response, Mr. Rowland includes the following statement: "The plaintiff declares under penalty of perjury that the above facts are true and correct."  (ECF No. 70 at 19.)
[3] Any new factual details alleged about Mr. Rowland's claims found in his Martinez report responses and the "Response to Defendants' Production of Documents" are disregarded because Mr. Rowland did not state them under penalty of perjury as required for any alleged facts to be considered as admissible evidence in a summary judgment proceeding.  (ECF Nos. 61, 64, 66.)  An exhibit that appears to be copied from a book or pamphlet titled "Our Troth" (ECF No. 61-4) and another document titled "Journal Cache County" (ECF No. 61-5) were also not verified and are also disregarded.  The court has previously notified Mr. Rowland of the evidentiary requirements on summary judgment.  (See Mem. Decision & Order, ECF No. 23 at 6–8.)  Further, Mr. Rowland may not bring other claims or defendants into this action by referring to them in any other post-complaint documents and, either subtly or overtly, indicating a wish for them or their roles to be litigated here.  Rule 15 of the Federal Rules of Civil Procedure clearly states that initial pleadings past the service-of-process stage may be amended "only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  This has not happened here.  As a result, any new attempted claims or defendants will not be considered further and the only claims and defendants validly at issue here are those specifically named in the SAC.  (ECF No. 22.)

## LEGAL STANDARDS

### I.  Pro Se Plaintiff

Mr. Rowland proceeds pro se.  The court therefore "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." Trackwell v. United States, 472 F.3d 1242, 1243 (10th Cir. 2007).  The court may not assume that Mr. Rowland can prove facts not asserted, or that the Defendants have violated laws in ways Mr. Rowland has not asserted.  See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 526 (1983); see also Drake v. City of Fort Collins, 927 F.2d 1156, 1159 (10th Cir. 1991) (holding that the court will not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues").  Mr. Rowland's pro se status does not entitle him to application of looser rules.  See Montoya v. Chao, 296 F.3d 952, 957 (10th Cir. 2002) (applying normal equitable tolling rules to pro se plaintiff).

### II.  Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] mere factual dispute will not preclude summary judgment; instead, there must be a genuine issue of material fact."  Cooperman v. David, 214 F.3d 1162, 1164 (10th Cir. 2000).  The court "look[s] at the factual record and the reasonable inferences to be drawn from the record in the light most favorable to the non-moving party."  Self v. Crum, 439 F.3d 1227, 1230 (10th Cir. 2006).

"Once the moving party has identified a lack of a genuine issue of material fact, the nonmoving party has the burden to cite to specific facts showing that there is a genuine issue for trial."  May v. Segovia, 929 F.3d 1223, 1234 (10th Cir. 2019) (citation omitted).  "Those specific

3

facts must be supported by particular parts of materials in the record … ; relying on mere

pleadings is insufficient."  Id. (citation omitted).  "Unsubstantiated allegations carry no probative

weight in summary judgment proceedings."  Self, 439 F.3d at 1230 (citation omitted).

The court notified Mr. Rowland of his burden on summary judgment by attaching the

complete language of Federal Rule of Civil Procedure 56 and District of Utah Local Civil Rule

56-1 to an order dated July 21, 2021.  (See ECF No. 23 at 6–8.)

**ANALYSIS**

**I.  Administrative Exhaustion**

The Defendants argue that all claims should be dismissed because Mr. Rowland did not

exhaust his administrative remedies in the CCJ grievance process.  (ECF No. 60.)  More

specifically, they contend, "The undisputed facts show that Plaintiff followed some but not all of

the[ required] steps with respect to each of his grievances."  (ECF No. 60 at 12.)

**A.  Legal Standards**

In enacting the Prison Litigation Reform Act of 1995 (PLRA), Congress "impos[ed] a

strict administrative-exhaustion requirement … [on] civil-rights claims filed by prisoners."

Pakdel v. City & Cnty. of S.F., 141 S. Ct. 2226, 2231 (2021) (per curiam) (citing 42 U.S.C. §

1997e(a)).  The applicable section states: "No action shall be brought with respect to prison

conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail,

prison, or other correctional facility until such administrative remedies as are available are

exhausted."  42 U.S.C. § 1997e(a).  The Supreme Court has often emphasized that "that language

is 'mandatory.'"  Ross v. Blake, 578 U.S. 632, 638 (2016) ("An inmate shall bring no action (or

said more conversationally, may not bring any action) absent exhaustion of available

4

administrative remedies.") (citation omitted); Woodford v. Ngo, 548 U.S. 81, 85 (2006) ("Exhaustion is no longer left to the discretion of the district court."); Gray v. Sorrels, 818 F. App'x 787, 791 (10th Cir. 2020) ("[T]he district court is not authorized to dispense with [the statutory exhaustion requirement].").  "There is no question that … unexhausted claims cannot be brought in court."  Jones v. Bock, 549 U.S. 199, 219–20 (2007) ("All agree that no unexhausted claim may be considered.").  Indeed, the PLRA requires compliance with "deadlines and other critical procedural rules," Woodford, 548 U.S. at 90–91, with no exceptions for "special circumstances."  Ramirez v. Collier, 595 U.S. 411, 421 (2022) (citation omitted); see Ross, 578 U.S. at 639 (stating that the "PLRA's text suggests no limits on an inmate's obligation to exhaust—irrespective of any 'special circumstances'"); Miller v. French, 530 U.S. 327, 337 (2000) ("The mandatory 'shall' … normally creates an obligation impervious to judicial discretion." (quoting Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 35 (1998))); see also McNeil v. United States, 508 U.S. 106, 111, 113 (1993) ("We are not free to rewrite the statutory text [when Congress has strictly barred] … claimants from bringing suit in federal court until they have exhausted their administrative remedies.").

The Supreme Court has held that the PLRA requires "proper exhaustion."  Woodford, 548 U.S. at 90. "Proper exhaustion" intends use of "all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)."  Id. (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)).  Indeed, the "rules are defined not by the PLRA, but by the prison grievance process itself."  Jones, 549 U.S. at 218; see also Little v. Jones, 607 F.3d 1245, 1249 (10th Cir. 2010) ("Because the prison's procedural requirements define the steps necessary for exhaustion, an inmate may only exhaust by properly following all

of the steps laid out in the prison system's grievance procedure." The Supreme Court concedes this requirement will stymie some prisoner cases, but observes that a "centerpiece of the PLRA's effort 'to reduce the quantity … of prisoner suits' is an 'invigorated' exhaustion provision, § 1997e(a)." Woodford, 548 U.S. at 84 (quoting Porter v. Nussle, 534 U.S. 516, 524 (2002)); see also id. at 103 (responding to the argument "that requiring proper exhaustion is harsh for prisoners, who generally are untrained in the law and are often poorly educated," the Supreme Court notes "that prisoners who litigate in federal court generally proceed pro se and are forced to comply with numerous unforgiving deadlines and other procedural requirements").

An inmate's failure to exhaust is an affirmative defense, Jones, 549 U.S. at 216, and the burden is on the defendant to prove the failure to exhaust, Roberts v. Barreras, 484 F.3d 1236, 1241 (10th Cir. 2007). But "[w]hen a defendant has established that an inmate did not exhaust his or her administrative remedies, the burden then shifts to the plaintiff to establish the grievance process was unavailable." Sanchez v. Corizon Health, Inc., No. 21-8069, 2022 WL 4857122, at *4 (10th Cir. Oct. 4, 2022).

Indeed, "PLRA contains its own, textual exception to mandatory exhaustion." Ross, 578 U.S. at 642. Section 1997e(a)'s exhaustion requirement depends on an administrative remedy's availability. See id. As explained by the Supreme Court, that means "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" Id. (quoting Booth v. Churner, 532 U.S. 731, 738 (2001)).

The Court further identified three situations "in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." Id. at 643. Those situations are as follows: (1) "[W]hen (despite what regulations or guidance materials may

6

promise) [the administrative procedure] operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates[,]" <u>id.</u>; (2) "[A]n administrative scheme might be so opaque that it becomes, practically speaking, incapable of use"—i.e., "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it[,]" <u>id.</u> at 643–44 ("When an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion"); and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation[,]" <u>id.</u>

**B.  Undisputed Material Facts for This Order Only**

1.  At the relevant time, Mr. Rowland was housed at CCJ, and the Defendants were all CCJ corrections officers.  (ECF No. 22 at 2.)

2.  CCJ's grievance process for inmates included the following relevant elements:

   a.  Definition of grievance: "a written inmate complaint within the jurisdiction of the facility alleging personal injury, loss, or harm caused by the application or omission of a policy or practice, a staff member or inmate action, or an incident …."  (ECF No. 59-1 at 3.)

   b.  "[T]he grievance system shall be a three-level system …."  (<u>Id.</u> at 4.)

   c.  "Within seven calendar days of a precipitating event (a specific event or the time when the inmate knew or should have known about a grievable situation), the inmate may … submit the [grievance] form to a grievance deputy."  (<u>Id.</u> at 7.)

   d.  "If unsatisfied with the [Level One] outcome, [the inmate may] request a review at Level Two … within three calendar days."  (<u>Id.</u> at 8.)

e.  An unsatisfactory Level Two outcome may be appealed "within 24 hours" of the
Level Two ruling.  (Id.)

3.  From November 2018 to February 2019, without notifying Mr. Rowland, Officer
Lucas denied and destroyed editions of Utah Prison Advocate Network (UPAN) newsletters
mailed to Mr. Rowland.  (ECF No. 22 at 4–5.)

4.  From December 2018 to March 2019, without notice to Mr. Rowland, Officer Lucas
denied and destroyed editions of Prisoner Legal News (PLN) mailed to Mr. Rowland.  (Id. at 3.)

5.  On December 8, 2018, a postcard to Mr. Rowland arrived in CCJ's mail.  (Id. at 6.)

6.  On December 9, 2018, Mr. Rowland received from Officer Carver a notice of denied
mail for the December 8 postcard, which "was placed in Plaintiff's property locker."  (Id.)

7.  On December 25, 2018, Mr. Rowland filed grievances in which he stated that he was
being denied mail from PLN and UPAN.  (ECF No. 59-2 at 3–4.)

8.  On December 26, 2018, Mr. Rowland's request for the December 8 postcard was
denied.  (ECF No. 22 at 6.)

9.  On January 1, 2019, a response to Mr. Rowland's grievance about denied mail from
UPAN stated: "The UPAN newsletter is considered a personal subscription.  I have made copies
that you may read while in the library from now on."  (ECF No. 59-2 at 3.)  Also on January 1, a
response to Mr. Rowland's grievance about denied mail from PLN stated: "Personal
subscriptions are not allowed."  (Id. at 4.)

10.  On January 7, 2019, Mr. Rowland filed a grievance about the December 8, 2018,
postcard.  (Id. at 5; ECF No. 22 at 6.)

11.  On January 9, 2019, a postcard to Mr. Rowland arrived in CCJ's mail.  (ECF No. 22 at 7.)

12.  On January 13, 2019, a response to Mr. Rowland's grievance about the December 8, 2018, postcard stated in relevant part: "The postcard … was denied [because] … it needs to have a return address and full real name of the person sending the postcard."  (ECF No. 59-2 at 5.)

13.  On January 18, 2019, Mr. Rowland received a notice of denied mail for the January 9 postcard from Officer Egbert, which "was placed in Plaintiff's property locker."  (ECF No. 22 at 7.)  Officer Egbert had "spilled a liquid on and bent the card … causing permanent damage to the postcard."  (Id. at 8.)

14. On January 20, 2019, Mr. Rowland filed a grievance for the denied January 9, 2019, postcard.  (See id. at 7; ECF No. 59-2 at 7.[4])

15.  On January 27, 2019, Officer Adams took and, with no notice, "disposed of" Mr. Rowland's paper with "runes" and information about "Plaintiff's northern European ancestors and the Asatru religion" (rune paper).  (ECF No. 22 at 8–9.)  Mr. Rowland filed a grievance about Officer Adams's procurement of the rune paper.  (ECF No. 59-2 at 8.)  The response stated, "Grievances must be handed directly to a grievance deputy."  (Id.)

16.  On January 28, 2019, Mr. Rowland filed an "Inmate Request and Grievance Form," on which the "grievance" box was checked, to challenge Officer Adams's taking of the rune paper.  (Id. at 12.)  A note on the grievance said, "This was placed in mailbox, graves picked up 1/29."  (Id.)  "This form was the first grievance form properly submitted [on this issue] and thus

---

[4] Mr. Rowland referenced the postcard he received on December 8, 2018, in his January 20, 2019, grievance, but, based on what he pled in the SAC, this appears to be a mistake.  The January 20, 2019, grievance concerns the postcard that Mr. Rowland received on January 9, 2019.

constituted the first step of the grievance process."  (ECF No. 59-4 at ¶ 57.)  Mr. Rowland

"submitt[ed] the grievance to a grievance deputy as required."  (Id. ¶ 53.)

    17.   On January 30, 2019, the following incident was noted on CCJ's log:

> A grievance appeal was placed in the mailbox.  Grave shift Sgt. Anderson passed
> this on to me.  I spoke with inmate [Rowland] about this.  He pointed out the
> handbook has an error and states in one place to put in mailbox.  Another place
> says to hand to grievance deputy.  The grievance appeal was given to Deputy
> Pierson[.]

(ECF No. 64-1 at 3.)

    18.   On February 1, 2019, a response to Mr. Rowland's grievance about the Defendant

Egbert-denied January 9, 2019, postcard stated in relevant part, "it needs to be formatted like any

other piece of mail so that we can easily identify the actual person sending it." (ECF No. 59-2 at

7.)  The date is unspecified, but for the postcard grievances, Mr. Rowland had worked

> with line staff to resolve the issue and it was granted by [Defendant] Egbert, who
> told the plaintiff to send a request to Deputy Hall and to the property department
> … which he did.  But Deputy C. Hammon stopped these proper request [sic] from
> going through to get the remedy that the plaintiff sought because of his revenge
> for Plaintiff's family calling the FBI on him.

(ECF No. 70 at 11.)  Also on February 1, a response to Mr. Rowland's January 28 "Inmate

Request and Grievance Form," about Officer Adams taking his rune paper, stated in relevant

part: "According to our policy, encoded messages are not allowed.  Therefore a key for creating

a coded message would be considered contraband.  The paper has been disposed of."  (ECF

No. 59-2 at 12.)  Mr. Rowland filed and "Inmate Request and Grievance Form," on which the

"Grievance Appeal" box was checked and "Level 1" was written, to challenge the February 1

response to his January 28 request-and-grievance form; Mr. Rowland continued to argue that his

"civil rights were violated by [Officer] Adams" for taking his rune paper "without cause."  (Id. at 13.)

19.  On February 4, 2019, a response to Mr. Rowland's February 1 request-and-grievance form about Officer Adams taking the rune paper stated in pertinent part, "[A]ny key that could create or translate code is contraband.  Also this is a level 1 grievance because your first action was a request since you put it in the box instead of giving it to a grievance deputy."  (Id.)  Also on February 4, Mr. Rowland filed an "Inmate Request and Grievance Form," on which the "Grievance Appeal" box was checked and "Level 3" was written, to challenge the February 4 response to his February 1 request-and-grievance form about Officer Adams's taking of the rune paper.  (Id. at 14.)

20.  After a February 19, 2019, "shakedown" of Mr. Rowland's cell, Officer Webb "damage[d] a number of papers containing very private and HIPPA protected medical information from the Utah State Hospital (USH) and other papers related to the appeal of the plaintiff's criminal case."  (ECF No. 22 at 9–10.)  With no notice, "Webb destroyed the two USH letters and the [plaintiff's] notes containing Utah law" and that dealt with the appeal of the plaintiff's criminal case.  (Id. at 11.)

21.  On March 2, 2019, Mr. Rowland told S. Peery "that during the time that his stuff was rolled up that he was missing … two envelopes."  (ECF No. 70-2 at 7.)

22.  On March 2, 2019, Mr. Rowland filed a grievance amending a grievance he filed on February 28, 2019; the amended grievance stated he had "multiple papers missing … includ[ing] two letters to the USH."  (ECF No. 59-2 at 16.)

23.  On March 11, 2019, a response to Mr. Rowland's March 2 request-and-grievance form about missing letters to USH stated in pertinent part,

> I do not see in your grievance if you tried to resolve this with Sgt. Webb.  It also does not state how, if any resolutions, were successful or not ….  Obviously staff should be careful during shakedowns.  If your property was damaged at that time they should have used more care.

(Id.)

24.  On March 12, 2019, Mr. Rowland filed an "Inmate Request and Grievance Form," on which the "Grievance Appeal" box was checked, to challenge the March 11 response to his March 2 request-and-grievance form about Officer Webb damaging or destroying his papers. (Id. at 17.)

25.  On March 13, 2019, a response to Mr. Rowland's March 12 "Grievance Appeal" stated in pertinent part, "Again, the items you listed were damaged & not destroyed.  As expressed before staff should take reasonable care while conducting searches.  It is not found that willful destruction took place."  (Id.)

26.  On March 14, 2019, Mr. Rowland filed an "Inmate Request and Grievance Form," on which the "Grievance Appeal" box was checked, to challenge the March 13 response to his March 12 "Grievance Appeal," continuing to raise the issue of Officer Webb's destruction of his USH letters and other legal notes.  (Id. at 18.)

27.  On March 25, 2019, a response to Mr. Rowland's March 14 "Grievance Appeal" about the USH letters and other legal notes stated, "The two letters you are missing are in your property locker.  This matter is closed."  (Id.)

28. On March 29, 2019, Mr. Rowland filed an "Inmate Request and Grievance Form," on which the "Grievance Appeal" box was checked, that contended, "This matter is not closed. Deliver the two letters about the USH to [Mr. Rowland]." (<u>Id.</u> at 19.)

29. On April 5, 2019, a response to Mr. Rowland's February 4 request-and-grievance form about Officer Adams taking the rune paper stated in pertinent part, "Text in code is considered a threat to the safety and security of the institution and the CCJ has a reasonable and legitimate penological interest to exercise considerable deference on this matter and remove such items from the facility." (<u>Id.</u> at 14.)

30. On April 6, 2019, a response to Mr. Rowland's March 29 request-and-grievance form about the USH letters and legal notes stated, "When you are released to the prison your property here will be released then—until that time it will remain in your locker.  There are no third level appeals." (<u>Id.</u> at 19.)

### C.  Exhaustion Analysis

Against this backdrop of law and facts, the court finds that it is undisputed that CCJ has a three-level grievance system.  (ECF No. 59-1 at 4.)  Therefore, Mr. Rowland was required to complete all three levels, as available, before bringing this federal civil rights action.

### 1.  Defendants Carver, Egbert, and Lucas

The evidence shows that Mr. Rowland did not file a Level Three grievance about the alleged constitutional violations of Officers Carver, Egbert, and Lucas.  For each of his claims regarding these defendants, Mr. Rowland filed a single Level One grievance.  (ECF No. 22 at 3–7; ECF No. 59-2 at 3–5, 7.)  No grievance forms past Level One have been placed in the record.

The court therefore finds that these three Defendants have met their burden of showing Mr. Rowland's failure to exhaust administrative remedies.

The burden then shifts to Mr. Rowland, who argues the grievance process was unavailable to him, apparently under the last of the three scenarios identified by the Supreme Court: "[W]hen prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross, 578 U.S. at 644.

Regarding Officer Lucas, Mr. Rowland argues the grievance process became unavailable to him because "[t]he moment that … Lucas disposed of the Plaintiff's … PLN [editions,] this act robbed the plaintiff of any available administrative remedy." (ECF No. 70 at 10.)  He goes on to contend that he "did not know the full extent of this issue until after leaving the CCJ and receiv[ing] … letters … from [PLN's publisher]." (Id.)  These arguments are unpersuasive. Mr. Rowland filed a timely Level One grievance on this issue.  To do so, Mr. Rowland had to be aware that he was missing the PLN editions.  But once his grievance was answered, he did not appeal to levels Two and Three.

Regarding Officers Carter and Egbert, Mr. Rowland asserts that in the grievance process he worked "with line staff to resolve the issue[s]" (around his failure to receive postcards) and "[his request] was granted by [Defendant] Egbert." (ECF No. 70 at 11.)  Egbert then "told the plaintiff to send a request … to the property department … which he did." (Id.)  But "Deputy C. Hammon stopped these proper request [sic] from going through to get the remedy that plaintiff sought." (Id.)  Based on these alleged circumstances, Mr. Rowland argues that "Deputy C. Hammon thwarted the plaintiff in continuing the grievance process." (Id.)  Mr. Rowland's argument about Deputy Hammon's actions is not well taken because Deputy Hammon's alleged

14

actions were not part of the grievance process itself; Officer Egbert "granted" the grievance, then recommended that Mr. Rowland send a separate request about the postcard(s) in property to Deputy Hammon.  (Id.)  Accordingly, Deputy Hammon was not thwarting the grievance process. And Mr. Rowland ostensibly could have engaged the grievance process afresh if—because of Deputy Hammon's separate behavior—the resolution he thought he had achieved with Officer Egbert had unraveled.  But he did not.  The court rejects these ineffective contentions.

The only evidence available to the court regarding Officers Carver, Egbert, and Lucas is that Mr. Rowland did not exhaust his grievances and has not carried his burden to show the grievance process was unavailable.  The court therefore grants summary judgment in favor of Officers Carver, Egbert, and Lucas.

### 2.  Defendants Adams and Webb

Defendants Adams and Webb also asserted Mr. Rowland's failure to exhaust as an affirmative defense for the claims against them.  But they set forth facts showing that Mr. Rowland filed the requisite three grievances for his separate claim against each of them.  Their argument that he failed to exhaust his grievances hinges on their allegations that Mr. Rowland did not "properly follow[] all of the steps laid out in the prison system's grievance procedure." (ECF No. 60 at 12 (quoting Little, 607 F.3d at 1249).)  More specifically, they take issue that he did not 1) indicate his efforts to resolve the grievances informally and 2) hand a grievance to the "Grievance Deputy."  (Id.)

### a.  Officer Adams and the Rune Paper

`The evidence shows Mr. Rowland's January 28, 2019, "Inmate Request and Grievance Form" (ECF No. 59-2 at 12) "was the first grievance form properly submitted [on this issue] and

15

thus constituted the first step of the grievance process."  (ECF No. 59-4 at ¶ 57.)  In addition, Mr. Rowland "submitt[ed] his grievance to a grievance deputy as required."  (Id. ¶ 53.)  CCJ's Level One response addressed the grievance's merits, denying a remedy.  (ECF No. 59-2 at 12.)  Mr. Rowland submitted a second grievance, continuing to argue that Officer Adams violated his rights.  (Id. at 13.)  CCJ responded, "[A]ny key that could create or translate code is contraband. Also this is a level 1 Grievance because your first action was a request since you put it in the box instead of giving it to a Grievance Deputy."  (Id.)  Mr. Rowland then filed a third grievance form concerning Adams's conduct, on which the "Grievance Appeal" box was checked, to challenge CCJ's last response.  (Id. at 14.)  CCJ again addressed the issue's merits when declining relief. (Id.)

Based on CCJ's second response, and trying to demote Mr. Rowland's Level Two grievance to Level One because Mr. Rowland deposited his original grievance in the "wrong" place, Officer Adams asserts Mr. Rowland did not exhaust as he did not "properly follow[]" the grievance steps.  See Little, 607 F.3d at 1249 ("[A]n inmate may only exhaust by properly following all of the steps laid out in the prison system's grievance procedure.").  But the court views the evidence in a light most favorable to Mr. Rowland, and the most favorable view of the original January 28, 2019, Level One grievance is found in the declaration of CCJ's grievance administrator deeming that the grievance was "properly submitted … to a grievance deputy as required" (ECF No. 59-4 at ¶ 53)—despite checking the box "Grievance Appeal"" and writing "Level 1," which are points that Officer Adams now takes issue with.  (ECF No. 60 at 8.) Further, CCJ's own log shows that CCJ staff made a note appearing to accept Mr. Rowland's point regarding a discrepancy in CCJ's handbook about where to deposit the grievance.  (ECF

16

No. 64-1 at 3.)  The record shows that Mr. Rowland progressively filed three timely grievances regarding Officer Adams's action.  And the grievance policy provides for three progressive levels.  Viewing the evidence in the light most favorable to Mr. Rowland, the court therefore concludes that Mr. Rowland met the CCJ's grievance requirements for his grievance about Officer Adams.

Officer Adams is not entitled to summary judgment on the basis of administrative exhaustion.

### b.  Defendant Webb and the USH Letters

CCJ answered Mr. Rowland's Level One grievance ambiguously, noting simultaneously that Mr. Rowland did not follow grievance policy when not including information of attempts at informally resolving issues before filing a formal Level One grievance, while also responding on the merits.  (ECF No. 59-2 at 16.)  At levels Two and Three, CCJ addressed only the merits. (ECF No. 59-2 at 17–18.)  And when Mr. Rowland filed yet another (fourth) grievance on this subject, CCJ addressed the merits again.  (ECF No. 59-2 at 19.)

Officer Webb argues that the part of CCJ's Level One response stating that Mr. Rowland had not abided by policy establishes that Mr. Rowland did not "properly follow[]" the grievance steps, negating a full round of a grievance process in which CCJ at every juncture (four opportunities) addressed the merits and never told Mr. Rowland his filings were invalid.  This argument is unpersuasive.

Based on the undisputed facts, supported by admissible evidence viewed in a light most favorable to Mr. Rowland, Officer Webb has not established that Mr. Rowland failed to exhaust

his administrative remedies in the grievance process.  The court therefore denies his bid for summary judgment on this basis.

## II. Qualified Immunity

Alternatively, Officers Adams and Webb assert the affirmative defense of qualified immunity as a basis for summary judgment in their favor.  (ECF No. 60 at 16–17.)  In other words, they contend they did not violate Mr. Rowland's clearly established constitutional rights, "creat[ing] a presumption that the[y] … [are] immune from suit."  Truman v. Orem City, 1 F.4th 1227, 1235 (10th Cir. 2021) (citation omitted).  Their contention shifts the burden to Mr. Rowland to show otherwise.  See Sawyers v. Norton, 962 F.3d 1270, 1282 (10th Cir. 2020) ("When a § 1983 defendant raises the qualified immunity defense, the burden shifts to the plaintiff.").

Mr. Rowland asserts in the SAC that 1) Officer Adams's disposal of his rune paper without notice and a chance to be heard violated his rights to due process and free exercise of religion; and 2) Officer Webb's destruction of letters and legal notes without notice and a chance to be heard violated due process.  (ECF No. 22 at 8–12.)  Mr. Rowland's response to the Defendants' qualified-immunity defense is contained in one sentence: "The defendants are not entitled to qualified immunity because the defendants violated clearly established constitutional rights of the plaintiff, under the First and Fourteenth Amendments."  (ECF No. 70 at 18.)

Having thoroughly reviewed the parties' arguments and evidence, the court disagrees and finds that the qualified-immunity defense shields Adams and Webb from further litigation in this matter.

### A.  Qualified Immunity Standard

Qualified immunity means that an official must have fair notice of the law before being subject to suit for damages for violating it.  Hope v. Pelzer, 536 U.S. 730, 739–40 (2002).  Two important interests are balanced by qualified immunity: "[T]he need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Pearson v. Callahan, 555 U.S. 223, 231 (2009).  Questions of qualified immunity should be resolved at the earliest feasible stage of litigation.  Anderson v. Creighton, 483 U.S. 635, 646 n.6 (1987).  Plaintiffs confronting qualified-immunity challenges in the Tenth Circuit do not face a higher-than-normal pleading requirement.  Currier v. Doran, 242 F.3d 905, 916–17 (10th Cir. 2001).

"The doctrine of qualified immunity shields officers from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  City of Tahlequah, Okla. v. Bond, 595 U.S. 9, 12 (2021) (per curiam) (quoting Pearson, 555 U.S. at 231); see also Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (stating qualified-immunity doctrine generally protects "government officials performing discretionary functions … from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known").  It means to shelter "all but the plainly incompetent or those who knowingly violate the law," City of Tahlequah, 595 U.S. at 12 (citation omitted), giving "government officials breathing room to make reasonable but mistaken judgments[.]"  Martinez v. Jenneiahn, No. 22-1219, 2023 U.S. App. LEXIS 17609, at *4 (10th Cir. July 12, 2023) (quoting City & Cnty. of S.F. v. Sheehan, 575 U.S. 600, 611 (2015)).

To be clear, when the qualified-immunity defense is raised, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." T.D. v. Patton, 868 F.3d 1209, 1220 (10th Cir. 2017) (citation omitted).  "A defendant is entitled to qualified immunity if the plaintiff fails to satisfy either prong."  Martinez, 2023 U.S. App. LEXIS 17609, at *5.

A right was "clearly established" if it was "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Mullenix v. Luna, 577 U.S. 7, 11 (2015) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).  Moreover, such a right must be "generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011) (quoting Zweibon v. Mitchell, 720 F.2d 162, 172–73 (D.C. Cir. 1983)).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).  A court should ask "whether the law put officials on fair notice that the described conduct was unconstitutional" instead of launching "a scavenger hunt for prior cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).  Indeed, based on existing precedent, the constitutional or statutory question must be "beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).

As a "longstanding principle," the Supreme Court instructs courts not to define the constitutional right in question "at a high level of generality." White v. Pauly, 580 U.S. 73, 79 (2017) (quoting al-Kidd, 563 U.S. at 742). Indeed, the clearly established law needs to be "particularized" to the case's facts. Anderson, 483 U.S. at 640. Without this requirement, "[p]laintiffs would be able to convert the rule of qualified immunity … into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Id. at 639. Still, "general statements of the law" are not necessarily incapable of clearly establishing a right, because they may at times give "fair and clear warning" to government employees. United States v. Lanier, 520 U.S. 259, 271 (2017); see Pauly, 137 S. Ct. at 552 (reiterating this principle). But, crucially, the "unlawfulness must be apparent." Anderson, 483 U.S. at 640; see Brosseau v. Haugen, 543 U.S. 194, 199 (2004) ("Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law.") (citing Hope, 536 U.S. at 738 (noting that in a case with an "obvious" Eighth Amendment violation, a materially similar case may not be needed for a right to be clearly established)). A court must thus ask if clearly established law establishes as improper the actions that the officer took in the case's circumstances. City of Escondido, Cal. v. Emmons, 139 S. Ct. 500, 503 (2019).

The clearly-established prong will generally be met if there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts … [has] found the law to be as the plaintiff maintains." Brown v. Montoya, 662 F.3d 1152, 1164 (10th Cir. 2011) (quoting Stearns v. Clarkson, 615 F.3d 1278, 1282 (10th Cir. 2010)).

Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case[.]"  Pearson, 555 U.S. at 236.

### B.  Undisputed Material Facts

#### 1.  Defendant Adams

On January 27, 2019, after "a shakedown," Officer Adams "showed plaintiff a paper with a 'summary table' and other notes consering [sic] the Old Norse language and the Asatru religion," asking Mr. Rowland to explain it "[be]cause [Adams] did not know what it was."[5] (ECF No. 22 at 8.)  Mr. Rowland told Officer Adams that "the paper was the runes [or 'runic alphabet'] and had to do with the Plaintiff's northern European ancestors and the Asatru religion."  (Id.; ECF No. 70 at 7, 14.)  Adams filed these details about the jail incident: "During a shakedown today I found writing that appears to me to be a form of coding for reading messages. For this I informed Inmate Rowland that I would be taking this paper because it appears to me to be coding information to write back and forth."  (ECF No. 59-2 at 9.)  Mr. Rowland was told "that the unique and irreplaceable personal property was disposed of" without notice or an opportunity to be heard regarding the "decision that [the] item [was] contraband."  (ECF No. 22 at 9, 13.)  "Plaintiff was 'NOT' disciplined for violating any rules."  (Id. at 9.)

#### 2.  Defendant Webb

Around February 19, 2019, related to "a shakedown," Defendant Webb "damage[d] a number of papers containing very private and HIPPA protected medical information from the

---

[5] Asatru is a "religion based on Norse mythology."  Warner v. Patterson, 534 F. App'x 785, 786 (10th Cir. 2013).

Utah State Hospital (USH) and other papers related to the appeal of the plaintiff's criminal case." (<u>Id.</u> at 9–10.)  Webb also destroyed "copies of two letters to the USH and a paper that the plaintiff had notes from the Utah law that delt [sic] with the appeal of the plaintiff's criminal case."  (<u>Id.</u> at 10.)  "Webb denied the plaintiff of any notice of the disposel [sic] [n]or provide[d] an opportunity to be heard."  (<u>Id.</u> at 11.)[6]

### C.  Qualified Immunity Analysis

To respond to the Defendants' assertion of a qualified-immunity defense, Mr. Rowland bears the burden of showing that Officers Adams and Webb violated his clearly established federal constitutional rights to due process and the free exercise of religion.  Mr. Rowland asserts that due process was breached when without notice and an opportunity to be heard 1) Officer Adams procured and destroyed his rune paper; and 2) Officer Webb procured and damaged or destroyed other papers.  (ECF No. 22, at 9, 11.)  And he asserts his free exercise rights were violated when Officer Adams destroyed his rune paper.  (<u>Id.</u> at 9.)

---

[6] The SAC's allegations against Defendant Webb are under the heading "Retaliation."  (ECF No. 22 at 9.) Mr. Rowland mentions other individuals who are not named defendants under the heading as well—i.e., roommate Paul Green and Sergeant T. Liquin.  It is unclear to whom Mr. Rowland may be referring as retaliating against him. The upshot is that the only allegations and cause of action specified for Officer Webb involve the denial of due process. (<u>Id.</u> at 9–11.)  Mr. Rowland's later acknowledgment in his summary judgment response of the elements of a retaliation claim and his vague attempt to link the elements to individuals, mentioning Officer Webb and other names, is insufficient to resurrect any type of retaliation claim, when, based on the SAC, Mr. Rowland did not state a claim upon which relief may be granted.  (ECF No. 22; ECF No. 70 at 16–18.)  In the SAC, Mr. Rowland neither recognized the elements of a retaliation claim nor affirmatively linked any retaliation allegations to a named defendant.  (ECF No. 22.)  The court therefore declines to discuss further any retaliation angle in this action.

### 1.  Breach of Constitutional Rights: Due Process Deprivation

Mr. Rowland alleges Officers Adams and Webb violated his due process rights, when before destroying Mr. Rowland's papers (containing runes and medical and legal information), they did not give Mr. Rowland notice and an opportunity to be heard.  (Id. at 9–11.)

"[A]n unauthorized … deprivation of property by a [county] employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533 (1984).  And the government "action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy." Id.  The question is whether the State of Utah or CCJ "provide[d Mr. Rowland] an adequate postdeprivation remedy for the alleged destruction of his property." See id. at 534.  This could be "a suit in tort," id. at 535, or "common-law remedies," id. at 534, or "the prison grievance procedure," Griffin v. Hickenlooper, 549 F. App'x 823, 828 (10th Cir. 2013).

As discussed above, the court holds that Mr. Rowland completed CCJ's grievance process for his claims against Officers Adams and Webb.  Mr. Rowland has not alleged that the post-deprivation remedy provided by the county was "inadequate" for due process purposes, arguing only that he did not have notice or an opportunity to be heard before his property was destroyed.  See Harris v. Chabries, 114 F. App'x 363, 365 (10th Cir. 2004) (noting that the plaintiff "failed to allege that state law post-deprivation remedies … were inadequate" and finding that without "such an allegation, the taking of his property does not violate due process"); Schlicher v. Gibbens, No. 92-3087, 1993 U.S. App. LEXIS 9131, at *6 (10th Cir. Apr. 20, 1993) (holding, when inmate's property was seized and destroyed, that the plaintiff "clearly

had an alternative state remedy: he presented both a property claim and an administrative grievance" and stating: "[t]he fact that plaintiff did not receive relief through these avenues does not entitle him to present his claim under § 1983"); see also Hudson, 468 U.S. at 539 (O'Connor, J., concurring) ("[I]n challenging a property deprivation, the claimant must either avail himself of the remedies guaranteed by state law or prove that the available remedies are inadequate.").

Here, CCJ's grievance process was the "post-deprivation remedy" provided by the government. It is not clear whether Mr. Rowland obtained relief from the grievance process. But it is the existence of the post-deprivation remedy that is dispositive, not the relief received. CCJ's grievance process fulfills the requirement that CCJ must provide a post-deprivation remedy for Mr. Rowland's missing and destroyed property. Mr. Rowland has thus failed to establish that Officers Adams and Webb deprived him of his property without due process.[7]

In sum, Mr. Rowland's allegations that Officers Adams and Webb breached his due process rights fail to meet his burden under the first prong of the qualified-immunity analysis that "the defendant[s'] actions violated a federal constitutional … right." Patton, 868 F.3d at

---

[7] Mr. Rowland believes that he necessarily has a remedy in federal court (even for damage to a bent and spilled-on postcard, (ECF No. 22, at 8)); but he, similarly to "many other pro se appellants, misperceives the use and purpose of § 1983. Section 1983 does not exist to right every wrong—it creates no enforceable rights. Section 1983 serves only to ensure an individual has a cause of action for violation of the Constitution and federal laws." Woolsey v. Dep't of Corrs., No. 91-1119, 1991 U.S. App. LEXIS 18184, at *3 (10th Cir. Aug. 1, 1991). In cases similar to this action,

> [c]ourts have held … that the existence of the alternative state remedy supplies "due process" and thus there is no "deprivation" by the state. Accordingly, in Parratt v. Taylor, 451 U.S. 527 (1981), where an inmate sued a warden [under] § 1983 over the loss of a hobby kit, the Court held the existence of a state tort claims procedure supplied due process and no federal claim could be presented. Parratt applied only to a negligent taking. Subsequently, in Hudson v. Palmer, 468 U.S. 517 (1984), the Parratt principle was extended to intentional taking. Thus, [such a plaintiff] has no claim.

Id. (cleaned up).

1220.  "A defendant is entitled to qualified immunity if the plaintiff fails to satisfy either prong."

Martinez, 2023 U.S. App. LEXIS 17609, at *5.  The court therefore denies the due process

claims against Officers Adams and Webb.

### 2.   Clearly Established Law: Free Exercise Violation

Mr. Rowland alleges that Officer Adams breached his free exercise rights when

destroying his rune paper.  (ECF No. 22 at 9.)  Mr. Rowland concedes that, when Officer Adams

took the paper, Officer Adams "said he is going to show the paper to the shift sergeant[] because

[Officer Adams] did not [know] what it was or if it was code."  (ECF No. 61 at 12.)  The court

finds that Mr. Rowland fails to carry his burden to demonstrate the second prong of the qualified

immunity analysis.

Mr. Rowland maintains that the law was clearly established that it was a violation of his

federal constitutional rights for Officer Adams to destroy his rune paper.  To determine whether

Mr. Rowland has met his burden of showing that these rights were "clearly established at the

time of the defendant's conduct," Ullery v. Bradley, 949 F.3d 1282, 1289 (10th Cir. 2020), the

court has carefully considered Mr. Rowland's responses to the Martinez report and the summary

judgment motion, (ECF Nos. 61, 66, 70), reviewing each of the cases Mr. Rowland cited in his

attempt to show that his rights were "sufficiently clear that every reasonable official would have

understood that [taking and destroying the rune paper] violate[d] th[ose] right[s]."  See Mullenix,

577 U.S. at 11 (quoting Reichle, 566 U.S. at 664); see also Martinez, 2023 U.S. App. LEXIS

17609, at *7 ("Mr. Martinez has presented no Supreme Court or Tenth Circuit case where an

officer acting under similar circumstances as [the defendants] was held to have violated [the

26

Constitution], [n]or has he shown that the alleged right is clearly established from case law in other circuits." (cleaned up)).

Because they are federal district court cases ineligible for consideration here, see Ullery, 949 F.3d at 1300, the court declines to entertain five of the cases cited by Mr. Rowland: Pickwell v. Newton, No. 3:17-CV-735, 2019 U.S. Dist. LEXIS 165752, at *10 (E.D. Va. Sept. 24, 2019) ("Pickwell's request for solid runes was initially rejected and he was provided with paper runes." (quoting from affidavit)); Warner v. Patterson, No. 2:08-CV-519, 2011 U.S. Dist. LEXIS 124367, at *34 (D. Utah Oct. 27, 2011) ("The substitution of rune cards for wooden runes has previously been upheld by this court and others under the Free Exercise Clause."); Polk v. Patterson, 2:07-CV-980-TC, 2011 U.S. Dist. LEXIS 53868, at *23–24 (D. Utah May 17, 2011) (stating defendants showed wooden runes were legitimate security concern); Keen v. Noble, No. CVF045645AWIWMW, 2007 U.S. Dist. LEXIS 25211, at *23 (E.D. Cal. Apr. 4, 2007) (concluding that prison policy prohibiting the plaintiff from personally possessing rune stones was supported by legitimate security concerns but that using rune cards was permitted); Rust v. Clarke, 883 F. Supp. 1293, 1302 (D. Neb. 1995) ("[S]uch members are also allowed to make runes").  (ECF No. 61 at 22; ECF No. 64 at 5; ECF No. 70 at 14–15.)

Instead, the court reviews the Supreme Court and circuit court cases cited by Mr. Rowland to determine whether he has met the second prong of his qualified immunity burden.

### a.  Thornburgh v. Abbott, 490 U.S. 401 (1989)

Mr. Rowland cites this case to substantiate the well-established and unremarkable proposition that "[i]t is … certain that '[p]rison walls do not form a barrier separating prison

27

inmates from protections of the Constitution.'"  (ECF No. 70 at 19 (quoting Thornburgh, 490 U.S. at 407).)

This case does not involve the Free Exercise Clause, and Mr. Rowland makes no attempt to analogize it to his facts or claim.  Under the Supreme Court precedent in Mullenix, 577 U.S. at 12, the court may not use this "broad general proposition" from Thornburgh, a factually dissimilar case, to reach a conclusion that the "violative nature of particular conduct is clearly established … in light of the specific context of the case."  Mullenix, 577 U.S. at 12 (cleaned up).  Mr. Rowland's citation to Thornburgh does not meet his burden of showing that Officer Adams violated a clearly established right.

### b.   Turner v. Safley, 482 U.S. 84 (1987)

In both his Answer to the Defendants' Martinez Report and his Response to the Defendants' Summary Judgment Motion, Mr. Rowland states that his possession of the rune paper did not result in disciplinary action "because the paper did not meet the Turner v. Safley standards and the paper was clearly religious material and constitutionally protected."  (ECF No. 61 at 21–22; see ECF No. 70 at 14).  Fatally, his conclusory words do not mention or try to analyze Turner's standard as it applies to the rune paper, let alone evince an understanding of the standard.  Further, though Turner provides a standard for analyzing whether a prisoner's First Amendment rights have been breached, Turner itself is not a free exercise case and so is not on point with the case before the court.  Turner, 482 U.S. at 81–82, 87–90.  Mr. Rowland's reference to Turner therefore does not meet the qualified immunity criteria for clearly established law.

### c.   Wolff v. McDonnell, 418 U.S. 539 (1974)

Mr. Rowland uses this case to support his broad statement that "a prisoner is not stripped of constitutional protections … to enjoy religious freedom … [and] they may not be deprived of property without due process of law."  (ECF No. 70 at 18 (quoting Wolff, 418 U.S. at 555–56 ("[A] prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime.  There is no iron curtain drawn between the Constitution and the prisons of this country. Prisoners have been held to enjoy substantial religious freedom under the First and Fourteenth Amendments….   Prisoners may also claim the protections of the Due Process Clause.  They may not be deprived of life, liberty, or property without due process of law.")).)

Mr. Rowland references one sentence from Wolff in his "Conclusion" to his summary judgment response, with no effort to analogize Wolff's facts to his circumstances.  In Wolff, the Supreme Court held that inmates facing loss of good-time credits in disciplinary proceedings must be afforded due process in the form of (i) "advance written notice of the claimed violation"; (ii) "a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken"; and (iii) allowance "to call witnesses and present [relevant] documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals."  418 U.S. at 563, 566.

None of these broad strokes of law are in question here.  Their applicability is accepted and honored.  Mr. Rowland has merely alleged the existence of general legal precepts, when his burden instead was to show "a substantial correspondence between the conduct in question and [how Wolff] allegedly establish[es] that the defendant[s'] actions were clearly prohibited."  See Watson v. Univ. of Utah Med. Ctr., 75 F.3d 569, 577 (10th Cir. 1996).  Mr. Rowland's citation

of this case does not help meet his burden to show the law regarding his free exercise claim was clearly established.

### d.  Krieger v. Brown, 496 F. App'x 322 (4th Cir. 2012)

Mr. Rowland cites this case for the following proposition: "The NCDOC also permits Asatru practitioners to possess several items for use in certin [sic] private worship practices, including the 'study of runes.'"  (ECF No. 61 at 22 (quoting Krieger, 496 F. App'x at 323).)  But this comes from the Fourth Circuit's recitation of the facts, not its legal analysis or conclusion.

In any event, the court

> need not analyze whether this decision is on-point with the facts alleged in Mr. [Rowland]'s complaint.  This is because a single out-of-circuit case does not satisfy the weight of authority approach for demonstrating the law is clearly established.  Accordingly, even assuming the [Fourth] Circuit decision is on-point, Mr. [Rowland] has not carried his burden on the clearly established prong of the qualified immunity analysis.

See Swanson v. Griffin, No. 21-2034, 2022 U.S. App. LEXIS 5179, at *12 (10th Cir. Feb. 25, 2022) (citing Routt v. Howry, 835 F. App'x 379, 385 (10th Cir. 2020); Christensen v. Park City Mun. Corp., 554 F.3d 1271, 1278 (10th Cir. 2009); Parkhurst v. Lampert, 339 F. App'x 855, 861 (10th Cir. 2009)).

Krieger is not a Supreme Court or Tenth Circuit case, nor does it alone establish a "weight of authority," so it is ineligible to be used as clearly established law that would have put this defendant in the Tenth Circuit on notice that certain conduct was unconstitutional.  See Toevs v. Reid, 685 F.3d 903, 916 (10th Cir. 2012).

### e.  Discussion

These cases are not "on point" precedent, in that they do not "involve[] materially similar conduct or appl[y] with obvious clarity to the conduct at issue."  Martinez, 2023 U.S. App.

30

LEXIS 17609, at *5 (quoting <u>Lowe v. Raemisch</u>, 864 F.3d 1205, 1208 (10th Cir. 2017)).  The first three of these cases are in the right category—United Supreme Court cases—but they are of the wrong level of generality.  Mr. Rowland has cited them to support high-level, axiomatic constitutional principles that everyone can agree on.  <u>See</u> <u>Moses-El v. City & Cnty. of Denver</u>, No. 20-1102, 2022 U.S. App. LEXIS 14847, at *30 n.20 (10th Cir. May 31, 2022) (concluding plaintiff's claims failed on the "second prong" of the qualified immunity analysis when plaintiff cited cases "at too high a level of generality" and neither of two cases cited were "factually analogous" to case at bar); <u>Swanson</u>, 2022 U.S. App. LEXIS 5179, at *7 ("[P]laintiffs may not identify their claim through 'extremely abstract rights' because this would 'convert the rule of qualified immunity … into a rule of virtually unqualified liability.'" (quoting <u>Pauly</u>, 580 U.S. at 79)); <u>Frasier v. Evans</u>, 992 F.3d 1003, 1014 (10th Cir. 2021) ("[T]he precedent must have clearly established the right in light of the specific context of the case, not as a broad general proposition." (citation omitted)).  And the last case is ineligible for consideration because it is a Fourth Circuit case.  <u>See</u> <u>Martinez</u>, 2023 U.S. App. LEXIS 17609, at *15 ("[T]wo cases from one other circuit are insufficient to clearly establish the law." (citing <u>Irizarry v. Yehia</u>, 38 F.4th 1282, 1294–95 (10th Cir. 2022))); <u>see also</u> <u>Swanson</u>, 2022 U.S. App. LEXIS 5179, at *7–8 ("[A]lthough Mr. Swanson attempts to rely on out-of-circuit authority to demonstrate that the right he asserts is clearly established under the weight of authority approach, only one of the three out-of-circuit decisions is potentially on-point.  But a plaintiff's identification of a single out-of-circuit case is not sufficient to satisfy the weight of authority approach.").

None of these cases, explicitly or implicitly, leads this court to hold that Mr. Rowland's federal free exercise rights were "sufficiently clear that every reasonable official would have

understood that [disposing of the rune paper] violates th[ose] right[s]."  See Mullenix, 577 U.S. at 11 (quoting Reichle, 566 U.S. at 664).  Even "[t]hough 'a case directly on point' is not required, 'existing precedent must have placed the constitutional question regarding the illegality of the defendant's conduct beyond debate.'"  Ullery, 949 F.3d at 1291 (quoting Cummings v. Dean, 913 F.3d 1227, 1239 (10th Cir. 2019), cert denied sub nom. Cummings v. Bussey, 140 S. Ct. 81 (2019)); see also City of Tahlequah, 595 U.S. at 13 (rejecting Tenth Circuit's use of cases with "dramatically different" facts to support Tenth Circuit's conclusion that officers violated clearly established law); Swanson, 2022 U.S. App. LEXIS 5179, at *7 (holding plaintiff did not establish the second prong when he "identified some generally applicable rules of law" but no "Supreme Court or Tenth Circuit case addressing a set of facts sufficiently similar").

In other words, Mr. Rowland has not provided authority that leads the court to find "the law to be as the plaintiff maintains."  Toevs, 685 F.3d at 916.  Mr. Rowland maintains that the Supreme Court and Tenth Circuit law, as it was when Officer Adams took and destroyed the rune paper, put Officer Adams on notice that his destruction of the rune paper violated the Federal Constitution.  Mr. Rowland has the burden to provide the case citations to support his contention.  See Patton, 868 F.3d at 1220.  The court finds that he has not carried that burden.

The qualified immunity inquiry "may appear unduly formalistic … But this is the task required of [courts] under the qualified-immunity precedents [courts] are obligated to follow."  Ullery, 949 F.3d at 1301; see also Lombardo v. City of St. Louis, Mo., 143 S. Ct. 2419, 2421 (2023) (Sotomayor, J., dissenting) ("The 'clearly established' prong of the qualified immunity analysis can pose a very high bar for plaintiffs seeking to vindicate their rights.  Even when government officials violate the law, qualified immunity shields them from damages liability

32

unless the 'violative nature of [the] <u>particular</u> conduct is clearly established.'" (quoting <u>Mullenix</u>, 577 U.S. at 12)).

After a thorough review of Mr. Rowland's responses to the Defendants' <u>Martinez</u> report and summary judgment motion (ECF Nos. 61, 66, 70) and based on the undisputed material facts taken in a light most favorable to Mr. Rowland, the court concludes that Mr. Rowland fails to meet his burden under the second prong of the qualified immunity analysis to show that Officer Adams violated "clearly established statutory or constitutional rights of which a reasonable person would have known." <u>City of Tahlequah</u>, 595 U.S. at 13 (quoting <u>Pearson</u>, 555 U. S. at 231). "A defendant is entitled to qualified immunity if the plaintiff fails to satisfy either prong." <u>Martinez</u>, 2023 U.S. App. LEXIS 17609, at *5. The court therefore denies the free exercise claim against Officer Adams.

### 3. Qualified Immunity Summary

Mr. Rowland has not carried his burden under either prong of the qualified immunity analysis. He did not successfully demonstrate that Officers Adams and Webb violated his federal constitutional right to due process by destroying his property. In addition, he did not cite clearly established law showing Officer Adams should have known that destruction of the rune paper violated the Free Exercise Clause of the Federal Constitution. Therefore, these defendants are protected from further litigation in this matter by the qualified immunity doctrine.

### ORDER

Officers Carver, Egbert, and Lucas are entitled to their affirmative defense of Mr. Rowland's failure to exhaust his administrative remedies. And Officers Adams and Webb are entitled to their affirmative defense of qualified immunity.

IT IS THEREFORE ORDERED that:

1.　　The Defendants' motion for summary judgment (ECF No. 60) is GRANTED.

2.　　On the basis of Mr. Rowland's failure to exhaust his administrative remedies,

Officers Carver, Egbert, and Lucas are DISMISSED from this action WITHOUT PREJUDICE.[8]

3.　　On the basis of qualified immunity, Officers Adams and Webb are DISMISSED

from this action WITH PREJUDICE.

4.　　No controversy remaining, the court directs the Clerk of Court to close the case.

DATED this 14th day of December, 2023.

BY THE COURT:

_____
Tena Campbell
United States District Judge

---

[8] Generally, "courts should … dismiss … unexhausted claims without prejudice." Fields v. Okla. State Penitentiary, 511 F.3d 1109, 1113 (10th Cir. 2007).